Filed 5/30/14  P. v. Hunter CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B249681 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA057774) |
| v. | |
| DAMIAN J. HUNTER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Carol Koppel, Judge.  Reversed.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant, Damian Hunter, challenges a conviction of second-degree robbery with an enhancement for firearm use and for two prior felony convictions. He claims the trial court erred in finding the prosecution exercised due diligence in unsuccessfully attempting to locate a witness and in the admission of her preliminary hearing testimony. We conclude the trial court erred in admitting prior testimony of a key witness and that this violated appellant's statutory and constitutional rights to confrontation. We reverse the conviction.

**FACTS AND PROCEDURAL SUMMARY**

On October 24, 2012, a woman called Rigatony's Pizza and Pasta in Lancaster and placed an order for pizzas, chicken wings, and sodas. She gave 3211 W. Avenue K-4 in Lancaster as the delivery address and 574-5495 as the callback number. Shortly after that, Rigatony's manager received a call from a woman who followed-up on the status of the same order.

At 8:20 p.m., Gary Delgrosso, a member Rigatony's delivery crew, arrived at 3211 W. Avenue K-4 and found an African-American female in her early twenties waiting on the sidewalk. Delgrosso took the food out of the truck while the woman reviewed the order ticket. A man wearing a red hooded sweatshirt approached Delgrosso, and then placed what appeared to be a shotgun to his stomach and demanded his money. Delgrosso had a "good look at his face" and described the robber as slightly shorter than his own six feet one half inches, weighing approximately 200 pounds, and wearing a red hooded sweatshirt. The man reached into Delgrosso's pocket and took out $80.[1] The robber and the woman walked east. Delgrosso got into his truck and drove away.

Delgrosso flagged down Los Angeles County Sherriff Deputies Andrade and Gonzales. The deputies searched for the suspects at the area where the delivery was made, then went to 3142 West Avenue K-4, the address of Robin Castro, whose cell

---

[1] Deputy Sheriff Diego Andrade reported that the amount taken was $200.

phone was used to place the order. Castro answered the door. Inside the apartment were appellant, another African-American male, Alonzo Smith, and an African-American female, Arial Hart. Deputies found a red hooded sweatshirt in Castro's closet. The pizzas and chicken wings, later identified by Delgrosso as the food he delivered, were found in the dining room. Deputies found $3 cash on appellant's person.

An hour after the robbery, the deputies conducted an eight-person curbside line-up which included the appellant. Delgrosso stated that none of those people looked like the robber. When asked whether it was appellant who robbed him, Delgrosso said appellant "didn't look like the guy" and that appellant was too tall. At trial, Delgrosso testified that appellant "looked like [the robber], but I can't say 100 percent, but it does look like him. He didn't have glasses on that night that I remember."

On November 7, 2012, Castro testified at the felony preliminary hearing. She said that appellant, whom she did not know very well, was at her apartment the night of the robbery. He borrowed her cell phone and left her apartment at 8:00 p.m. without saying where he was going. Appellant was gone for 45 minutes and returned with pizza and chicken wings. He was wearing a red sweatshirt when he left but was not wearing it when he returned. She identified the sweatshirt found in her closet as the "sweater" and said it did not belong to her or her roommate.

On November 20, 2012, appellant was charged with second-degree robbery with use of a firearm. Two previous felony convictions also were alleged as prior felony conviction "strikes" pursuant to Penal Code sections 1170.12, subdivisions (a) through (d) and 667, subdivisions (b) through (i).[2] The case was called for jury trial on February 26, 2013, but the next day, the prosecution answered they were unable to proceed, and moved to dismiss the case under section 1387.2. Appellant stipulated to the section 1387.2 proceeding, and waived his right to a preliminary hearing and to have the case refiled. He was arraigned under the same case number. A new trial date was set on April 17, 2013, but due to a conflict with trial counsel's schedule, the trial was

---

[2]Statutory references are to the Penal Code unless otherwise indicated.

3

rescheduled on April 29, 2013. The prosecutor did not assign someone to locate Castro, and subpoena her for trial, until April 2th.

On May 2, 2013, a due diligence hearing was conducted with respect to Castro's unavailability. Detective Ruiz, the person assigned to find Castro, testified about his efforts to locate her. On April 29, he checked the district attorney's database and found two or three possible addresses. He called Castro's phone but did not get an answer. He went to her address on 3141 W. Avenue K-4 and found that a new tenant had been living there for a month. Then, Ruiz went to Palmdale and spoke to Castro's grandmother, who gave him another telephone number for Castro. He called that number but no one answered. He left a message. He looked into the Los Angeles County booking records. He also checked with the Antelope Valley Hospital. On April 30, Ruiz checked the San Bernardino County bookings. Those efforts yielded no results. He did nothing else on the case that day.

On May 1, Ruiz called Castro again and left a message. A person, who identified herself as Castro, returned the call and gave an address in Lancaster where they could meet. Going to that address, Ruiz found that Castro was not there, but spoke to someone else, a man named "Carlton," who told him Castro was staying there, though she was somewhat transient. Ruiz left the subpoena and asked Carlton to tell Castro to call him as soon as she saw it. Castro did not call. Ruiz went back the next morning, May 2, the day of the due diligence hearing. Carlton informed him that Castro was not there and might be at work at Desert Haven in Lancaster. Ruiz called Desert Haven and was told they did not have an employee named Castro. Ruiz did not go to the location. Ruiz checked the third address in the database but did not find Castro.

The trial court concluded that the prosecution exercised due diligence and declared Castro unavailable, and on that basis ruled that Castro's testimony at the felony preliminary hearing was admissible under the former testimony hearsay exception. (Evid. Code, § 1291.) Castro's prior testimony was read to the jury. The jury returned a guilty verdict and also found the allegation of firearm use to be true. Appellant waived

jury trial on the priors.  At a hearing, the trial court found the prior conviction allegations to be true.

Appellant was sentenced to 25 years to life in prison for the second-degree robbery and 10 years for the firearm use.  The court imposed an additional five year term on each of the two prior felonies, for a total of 10 years pursuant to section 667.  The court also imposed an additional one-year term for each of the two prison priors.  The aggregate sentence was 47 years to life.

Appellant filed a timely notice of appeal.

## DISCUSSION

### I

The core issue in this appeal is whether admitting Castro's prior testimony violated appellant's constitutional right to confront his accuser.  We conclude it did.

A criminal defendant's right under the Confrontation Clause of the Constitutions of the United States and the State of California to be confronted with the witnesses against him is subject to an exception for the testimony of an unavailable witness who has been subjected to cross-examination during testimony in a prior judicial proceeding in the same matter.  (*People v. Herrera*  (2010) 49 Cal.4th 613, 620–621 (*Herrera*); U.S. Const., 6th Amend.; Cal. Const. art. 1, § 15.)  In California, this exception is codified in Evidence Code section 1291, which states, in pertinent part:  "former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and . . . ¶ [t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."  (Evid. Code, § 1291.)  When Evidence Code section 1291 is satisfied, admission of the former testimony does not contravene the defendant's constitutional right to confrontation.  (*Herrera,* at p. 621; *People v. Friend* (2009) 47 Cal.4th 1, 67.)

It is undisputed that appellant was represented at the preliminary hearing where Castro's testimony was given, and that he had the opportunity to cross-examine Castro

5

with the similar interest and motive as he would have at trial. The issue is whether Castro was unavailable to satisfy the exception to the Confrontation Clause.

Under federal constitutional law, the prior testimony of an unavailable witness, who was subjected to cross-examination , is admissible "'if the prosecution shows it made "a good-faith effort" to obtain the presence of the witness at trial.' [Citations.]" *(People v. Bunyard* (2009) 45 Cal.4th 836, 849.) "The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." (*Ohio v. Roberts* (1980) 448 U.S. 56, 74, disapproved on another point in *Crawford v. Washington* (2004) 541 U.S. 36, 60–68.)

This requirement is codified in Evidence Code section 240, subdivision (a)(5), which deems a witness unavailable when she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." "[T]he burden is on the government to prove it has exercised good faith and due diligence in attempting to secure a witness's attendance for trial. [Citation.] (*People v. Roldan* (2012) 205 Cal.App.4th 969, 980.) Due diligence implies "'"persevering application, untiring efforts in good earnest, efforts of a substantial character."'" [Citation.]" (*People v. Cogswell* (2010) 48 Cal.4th 467, 477.)

The standard for due diligence cases is well-settled. First, we review the trial court's factual findings under the deferential substantial evidence standard, then, we review de novo whether the facts determine that the prosecution exercised due diligence in procuring the witness for trial. (*Herrera*, *supra*, 49 Cal.4th at p. 623; *People v. Cromer* (2001) 24 Cal.4th 889, 902–903 (*Cromer*).) Relevant considerations include the timeliness of the search, the importance of the proffered testimony, and whether leads were competently pursued. (*Herrera*, *supra*, 49 Cal.4th at p. 623; *Cromer*, at pp. 902–903.)

After Detective Ruiz's testimony about his search for Castro, the trial court found due diligence. The facts concerning Ruiz's efforts are undisputed. We review de novo whether those facts meet the constitutional requirement for due diligence.

6

First, we analyze the importance of Castro's testimony. In *People v. Louis* (1986) 42 Cal.3d 969, 991–995 (*Louis*), overruled on another ground in *People v. Mickey* (1991) 54 Cal.3d 612, 672, fn. 9, the most critical evidence for the prosecution's case was the prior testimony of Tolbert, an absent witness. (*Id.* at p. 989.) As the court observed, "the sole evidence identifying defendant as the trigger man came from him." (*Ibid.*) The Court also noted that there was "no witness whose credibility was more suspect than Tolbert." (*Ibid.*) He was convicted of several felonies, habitually failed to make court appearances, and was expecting a reward if defendants were convicted as a result of his testimony. (*Ibid.*) In reaching the conclusion that the prosecution did not exercise due diligence, the Court reasoned that the expectation of diligence is particularly high when the witness's testimony is critical for the conviction. (*Id.* at p. 991.) The Court further explained that the need to cross-examine the witness in front of the jury becomes even more compelling when the witness's reliability and credibility are suspicious. (*Ibid.*)

We find Castro's prior testimony, like the witness's testimony in *Louis*, *supra*, 42 Cal.3d 969, to be the critical evidence in this case. The Attorney General seems to concede this point. Delgrosso, the victim, who stood face to face with the robber and claimed to have had a good look at the robber's face failed to identify appellant at the curbside line-up an hour after the incident. Although he gave a description of the robber: his height and weight, and the red hooded sweatshirt he was wearing, at the curbside line-up, he told the officers "[appellant] didn't look like the guy" and "he was too tall." In court, Delgrosso testified that the appellant looked like the robber but he "can't say 100 percent." The money stolen from the victim was claimed to be $80 or $200 but deputies only found $3 on appellant.

Castro's testimony bolstered the prosecution's case. Castro testified that appellant, who was a stranger to her, was in her apartment that night close to when Delgrosso made the delivery. Appellant borrowed her cellular phone and left her apartment at 8:00 p.m. Castro's phone records showed calls to Rigatony's Pizza at 7:14 p.m., 7:49 p.m., and 8:10 p.m. that night. Castro also stated that appellant returned with pizza and chicken wings after 45 minutes, and that he no longer wore the red hooded

7

sweatshirt he was wearing when he left. She identified the sweatshirt found in her closet as the "sweater."

Castro's testimony is the linchpin of the prosecution's case. Castro placed the appellant near the scene of the crime, provided the timeline that established opportunity, and connected appellant to the red hooded sweatshirt, the cellular phone, and the food that Delgrosso delivered. Without this evidence, prosecution's case is weak.

Moreover, Castro's reliability and credibility, like the witness's in *Louis*, *supra*, 42 Cal.3d 969, are also suspect. A woman made the delivery call to Rigatony's, Castro's cellular phone was used to place the order, and Delgrosso found an African-American woman waiting for the delivery. The police found what was left of the pizza and chicken wings in Castro's home and the red sweatshirt in her closet. The evidence suggests a relationship between Castro and appellant. Her involvement in the robbery and motives for testifying make her credibility an issue and thus fair game for cross-examination.

Secondly, we examine the prosecution's efforts in pursuing competent leads. Due diligence is exercised when the prosecution makes reasonable efforts to explore competent leads. (*People v. Wilson* (2005) 36 Cal.4th 309, 342.) The law does not require the exhaustion of all possible avenues to find the witness. (*Ibid* [noting that the standard is one of reasonableness and whether "additional efforts might have been made or other lines of inquiry pursued" is not dispositive in finding due diligence].) However, under the facts of this case, we find that Detective Ruiz did not exert reasonable efforts to satisfy due diligence.

Detective Ruiz made several calls to Castro, visited her grandmother, and checked county bookings and hospital records. He also pursued a contact given by Castro's grandmother, which led him to Carlton. He found out, through Carlton, that Castro was working at Desert Haven, which he called only to find out that they don't have an employee named "Castro." But Desert Haven was also in Lancaster. A reasonable officer would have paid a visit and looked for Castro himself. Desert Haven workers could have identified Castro through a photograph in case she was using an alias. Moreover, Ruiz failed to contact Smith and Hart, Castro's friends who were present at the

8

apartment on the night of the robbery. These leads were readily available to him because the deputies took their contact information that night. If he had begun his search earlier, he could have had more time to pursue these leads. The prosecution did not exert reasonable efforts in pursuing obvious and promising leads.

Lastly, we consider the timeliness of the search. Due diligence is exercised when the prosecution starts locating the witness within a reasonable time before the trial. (*Wilson*, *supra*, 36 Cal.4th at p. 342.) Appellant contends that the prosecution's delay in searching for Castro falls short of the due diligence required by the Constitution in establishing unavailability. We agree.

The prosecution had ample opportunity to search for Castro since February 26, the first trial date. The trial was rescheduled several times but no efforts were made and no subpoena was issued prior to April 29, the day the trial actually commenced. The prosecution, aside from arguing that due diligence "can be shown in one day if necessary," did not provide any explanation or justification for the delay.

While the prosecution is not expected "'to keep "periodic tabs" on every material witness'" and to take all preventative measures to keep the witness from disappearing without knowledge of substantial risk that the witness would flee (*Wilson*, *supra*, 36 Cal.4th at p. 342), under the circumstances of this case, the prosecution's unexplained delay cannot satisfy the constitutional requirement for due diligence. The prosecution failed to meet its burden of proving it acted within a reasonable time. Nor did the prosecution show that earlier efforts would have been futile. (*Herrera*, *supra*, 49 Cal.4th at pp. 623–631 [concluding that delay is irrelevant because witness was deported to Poland several months earlier].)

The prosecution did not reasonably pursue competent leads and delayed the search for Castro without justification. In light of the critical role of Castro's testimony in convicting the appellant and the need for the jury to examine her credibility as a witness, we conclude that the prosecution failed to exercise due diligence. The trial court's admission of Castro's prior testimony violated appellant's right under the Confrontation Clause of the Federal and State Constitutions. Conviction would have been unlikely

without Castro's testimony.  The error prejudiced the outcome of the trial and so we must reverse the conviction.

II

Appellant challenges the sentence enhancement under section 667.  The trial court imposed two five-year terms, one for each of appellant's prior serious felony convictions.  Appellant's prior convictions arose from one case, which contravenes the requirement of section 667 that the prior "strikes" must have been "brought and tried separately."  (§ 667, subd.(a)(1).)  Respondent concedes error on this point.  Because they stem from one case, it was error to impose separate five-year terms for each of the prior convictions.

**DISPOSITION**

The trial court's judgment is reversed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:


WILLHITE, J.


MANELLA, J.


10